1

2

3

4

5

6

THE HONORABLE TANA LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

SHABNAM DAWN PILISUK,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

No. CR22-001-TL

SHABNAM PILISUK'S
REDACTED SENTENCING
MEMORANDUM

13

14

15

16

17

By the time Shabnam (Kathryn) Pilisuk reached the age of 30 years old, she had experienced unimaginable trauma: childhood sexual abuse, being groomed and trafficked as a preteen and teenager, extreme neglect, poverty, emotional abuse, mental illness and, eventually, a marriage to a man 13 years her elder who exerted extreme emotional, physical, and financial control over her.

18

19

20

21

22

23

Ms. Pilisuk has always struggled to understand or fit in with the world around her. Autism has colored her understanding and response to every social interaction she ever had—from toddlerhood in California to the present day in the federal prison system. This invisible and undiagnosed disability made her vulnerable to abuse and left her out of sync with social norms, rigidly fixed in her concept of fairness and rules, and hyper-fixated on random (and often controversial) issues.

24

25

26

Ms. Pilisuk faces a mandatory minimum sentence of 30 years. Even if this Court has no doubt about the verdict reached by the jury in this case, a 30-year sentence is not justice. It is not commensurate with other sentences received by similarly situated

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

defendants in this district. It is far greater than necessary. And the government's decision to charge this particular statute cabins the Court's ability to consider Ms. Pilisuk's unique characteristics, the low likelihood that she will repeat this conduct, her desire to rehabilitate, or any other mitigation.

Imposing a sentence on Ms. Pilisuk requires consideration of the lens through which she has understood the world. It also requires bearing witness to the horrors she lived through and recognizing her history of dismissing or rationalizing her suffering. The defense hopes that this memorandum provides some of that context.[1]

Shabnam Dawn Pilisuk, through counsel, asks the Court to find that the 30-year mandatory minimum sentence required by 18 U.S.C. § 2241(c) is unconstitutional and impose a sentence of 15 years in custody.[2]

## I.   MS. PILISUK'S HISTORY AND CHARACTERISTICS

Ms. Pilisuk was born Dawn Annette Sherrick in ███ of 1984. Her parents' relationship was tumultuous. Her mother, Lorette Sherrick, was paranoid, delusional, and had frequent psychotic episodes. Her father was an alcoholic who physically abused her mother. There was no stability, structure, or safety in Ms. Pilisuk's home.

When her father left and moved to Las Vegas, Ms. Pilisuk lived alone with her erratic and unstable mother in California. Lorette Sherrick was unable to keep a job and did not attend to her daughter's basic hygiene or nutritional needs. Mrs. Sherrick's paranoia, distrust of authority, and delusional thought patterns were normalized in their

---

[1] This context and mitigation could and should have been developed and presented as the basis for meaningful plea negotiations prior to Ms. Pilisuk's trial.

[2] If the Court finds that the mandatory minimum sentence of 360 months in custody does not violate the Eighth Amendment, Ms. Pilisuk requests that the Court sentence her to the minimum term on each count and run all sentences concurrent with each other.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

home, as was the expectation that Ms. Pilisuk—even in elementary school—would protect and take care of her mother.

Mrs. Sherrick's mental illness led to particularly insidious damage to her daughter. Because of her autism, Ms. Pilisuk was less capable of recognizing social norms, appropriate behavior, or healthy relationships outside of her home. Instead, the toxic relationship she had with her mother became the baseline and set the rules she adhered to. While her mother's neglect, distorted thinking, and catastrophic social programming of Ms. Pilisuk may not have been intentional, the long-lasting impact is acute. Ex. 1 (Shabnam Pilisuk Letter to Court) (noting her own treatment of █████ as a "comrade and friend").

### A.    Hospitalizations, Elementary School, and Kansas

After multiple evictions from apartments in California, Ms. Pilisuk and her mother moved to Kansas when she was approximately seven years old. They initially moved in with a maternal aunt and uncle.

Ms. Pilisuk's uncle began sexually abusing her almost immediately. He first raped her when she was eight years old after a year of non-penetrative sexual abuse. Despite reporting the abuse to her mother, Ms. Pilisuk does not think her mother believed it. Certainly, no one ever reported the abuse to law enforcement. Ex. 2 (Transcript Excerpt) at 512; Ex. 3 (Report of Dr. Laurie Sperry) at 32; PSR ¶ 72.

In 1994, when Ms. Pilisuk was in fourth grade, her elementary school (likely after intervention from Child Protective Services) referred her for a psychiatric assessment.[3] She was hospitalized for two weeks. She was observed to have "poor

---

[3] Records indicate that a year before this hospitalization, Ms. Pilisuk was diagnosed as █████████ by either a mental health provider or other service provider. Despite numerous attempts to secure information relating to the ongoing involvement of Child Protective Services with Lorette Sherrick, defense counsel has been unable to locate these records.

FEDERAL PUBLIC DEFENDER
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

awareness of social rules, bizarre statements, idiosyncratic words and some acknowledgement that she heard voices that others didn't hear and saw people that others didn't see. It was noted that there was a rich fantasy life." Ex. 4 (Prairie View Records, 1994–1996); *see also* Ex. 3 at 8 (noting that in 1994 the DSM IV had just been published and the identification of a "pervasive developmental disorder" was used as an umbrella term for children with autism as well as other disorders). Her problematic and unique relationship with her mother was a core concern. *Id.*

Despite this early intervention and the identification of developmental, biological, and environmental red flags, Ms. Pilisuk received no follow-up services. She was not removed from her mother's care. In fact, during her hospitalization two years later, her medical team specifically observed that "since [1994] the mother had a very disruptive and isolative life pattern with multiple moves and multiple efforts to continue to engage Dawn in her very paranoid persecutory view of the world with lack of recognition of their own inappropriate behavior." Ex. 4 at 6. Ms. Pilisuk's age, isolation, and neurodevelopmental disorder made her incredibly vulnerable to the delusions that her mother fixated on. Ex. 3 at 31 ("Children with ASD present with additional risk factors such as social isolation, family stress and communication difficulties.").

In Kansas, Ms. Pilisuk was being put into increasingly more dangerous situations where she was taken advantage of and sexually abused by trusted adults. So began her pattern of rationalizing this abuse as a way to gain "control" and "power." PSR ¶ 72–73. This distorted thought process is unsurprising. Within the last year, her mother's recollection and characterization of a then 11-year-old Ms. Pilisuk sitting on the lap of a

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

man who "bought them some food when they were hungry"[4] injected an assumption of intention and sexuality that a child is not capable of. Ex. 3 at 14.

In 1996, Lorette Sherrick was hospitalized in a mental health institution for a psychotic break. Neighbors had accused her of "put[ting] hexes" on them and/or abusing cats. Ex. 4 at 5. After being removed from her mother's care, Ms. Pilisuk was referred to inpatient mental health treatment after she "continued to engage in provocative behavior with others and claimed to be harassed while not recognizing her own aggressive behavior" in her group-home placement. *Id.* Ms. Pilisuk was just 12 years old.

By this time, Ms. Pilisuk had developed "preoccupations" with witchcraft and other controversial subject matters. *Id.* Her psychological assessment documented "cognitive rigidity…heavy social overtures, difficulty with peers, overfamiliarity with the center staff, idiosyncratic language, difficulty being redirected" and numerous other symptoms of her yet-undiagnosed ASD. Ex. 3 at 9; Ex. 4 at 6.

This final hospitalization in Kansas seems to have been the last available childhood offramp for Ms. Pilisuk. As she spent more time away from her mother, she began to acknowledge that she was being asked to do "adult tasks and that she was placed in the impossible situation of feeling responsible for, but having no ability for being able to complete tasks such as finding a new house." Ex. 4 at 7.[5] Her care team noticed there were strategies that helped Ms. Pilisuk communicate concerns and let down her guard.

---

[4] Mrs. Sherrick incorrectly believed they were in Nevada at the time of this incident. At 11 years old, Ms. Pilisuk and her mother still lived in Kansas.

[5] When reviewing this portion of the records with Ms. Pilisuk, she noted that she had, in fact, solved their housing problem by reaching out to her father and telling him that she was going to be taken away from her mother. She then followed his instructions on how to get both her and her mother to Nevada, where they lived on his mother's property.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    However, they also "recognized in this admission that any direct challenge to the

2    symbiotic and role-reversed relationship would only further arouse the mother's fear

3    and defensiveness and thus trigger [Ms. Pilisuk's] fear and defensiveness." Ex. 4 at 7.

4    Unfortunately, this is exactly what happened. As soon as she was reunited with her

5    mother, Ms. Pilisuk called her father in Nevada and told him they believed that she

6    would be removed from the home, imminently. He dictated an "escape plan," which

7    Ms. Pilisuk implemented exactly as he directed.

8        Within weeks, she and her mother were in Nevada.

9    **B.    Nevada, Drugs, and Criminal Contacts**

10       Ms. Pilisuk was discharged from inpatient mental health treatment in June of

11   1996. Three months later, she was seen by a nurse in her new school district in Clark

12   County, Nevada. Ex. 5 (Clark County School Records). The handwritten nurse's notes

13   indicate that referrals were made to have Ms. Pilisuk seen for a psychiatric evaluation

14   almost immediately. *Id.* Unsurprisingly, the referral was never acted upon because her

15   parents claimed to have "misplaced" it. *Id.*

16       Of course, what these early school records do not reflect was Ms. Pilisuk's

17   growing obsession and hyper-fixation on drugs and crystal methamphetamine. *See*

18   Ex. 1 at 1. They do not reflect her continued victimization and sexual abuse by a

19   number of men more than twice her age, including the father of her best friend and her

20   own father. Ex. 3 at 31 ("people with ASD are sexually assaulted at a rate seven times

21   higher than their nondisabled peers…more likely to be assaulted by someone they know

22   [] during daylight hours."). By the time she was 15 years old, in December of 1999, she

23   had been arrested for public intoxication. *Id.* (children with autism's "social naivete and

24   impaired social skills increases their risk for both victimization and contact with the

25   juvenile and criminal justice system") (internal citation omitted).

26

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Even more disturbingly, from 1999 until approximately early 2001, Ms. Pilisuk was being sex-trafficked by adult handlers. Just after her 16th birthday in January of 2000, she was sent by her pimp to solicit an undercover officer. She was arrested. Ex. 6 (Selected Records from Clark County Juvenile File) at 1. While still on probation for this offense, in July of 2000, she was found "in a car [in California] with an unrelated adult [40-year-old] male, who was carrying the components to a meth-lab in his car." Ex. 6 at 2. When contacted, her mother "didn't appear concerned about monitoring [her] minor's whereabouts." *Id.*

At 16 years old, Ms. Pilisuk's life was in a tailspin. She was being regularly abused by adult men, she was in what she considered a "consensual relationship" with her biological father, and she was using crystal methamphetamine and heroin. Ex. 6 at 3 ("Dawn appears very emotionally fragile…highly stressed appears more mental health issues than drug issues. Involved with Wikka…adult boyfriend and his current situation."). She had basically stopped attending school, and her mother's combative behavior and negligence continued. Ex. 6 at 4 (during required program "[o]bservations made were mother's erratic behavior and [Ms. Pilisuk] very pre-occupied with talk of drugs and drugs only.").

It is hard to imagine this portrait of a young woman ending well. And yet, within a year, Ms. Pilisuk's life had completely changed.

## C.    Marriage, Islam, and Education

As she discusses in her letter to the Court, Ms. Pilisuk's hyper-fixation on drugs and Wicca began slowly morphing into an obsession with Iran and what she mistakenly believed were her Middle Eastern roots. Ex. 1. A family friend she believed to be her grandfather began putting pressure on her to get married. She met her first husband, Junes ███████, when she was 16 years old. They were religiously married the

following year, after receiving the blessing of her "grandfather" and the mosque leaders. Just after she turned 18 years old, they were legally married.

In 2003, having converted to Islam and been married for approximately two years, Ms. Pilisuk was pulled over and informed that she had a warrant for violating her juvenile probation. She immediately contacted the court. Despite the fact that she had been noncompliant with almost every single condition of her probation while she was being actively supervised, the Clark County Department of Family and Youth Services recommended that her probation be terminated because she was "married, attending school and working a full time job." Ex. 6 at 7.

Ms. Pilisuk (and her mother) credit her marriage to Junes for this complete turnaround of her life. While not excusing the abuse and control she was subjected to in that marriage, it is easy to imagine the relief she must have felt as an autistic woman finally being provided with "rules, rubrics and checklists." Ex. 3 at 34. She was *encouraged* to obsess and fixate on the laws and customs of Islamic culture. Her compulsive need for information and guidelines was rewarded. Her social deficits were masked and subsumed by her devotion to her husband and their culture.[6]

Ms. Pilisuk deserved that structure and support long before she found it. She deserved that structure and support in a relationship that did not come with the baggage of control and abuse. And she deserved that structure and support to be coupled with an understanding of why her perception of the world *was* different from others and how to manage that difference. Although imperfect, her marriage to Junes allowed her to move forward, learn new values and social norms, and gain sobriety, an education, and a renewed sense of value.

---

[6] Ms. Pilisuk's mother also moved in with her and Junes. Throughout her life, Ms. Pilisuk continued (and continues) to believe that her mother's safety is her responsibility.

SENTENCING MEMORANDUM
(*U.S. v. Pilisuk*, CR22-001-TL) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### D.      Divorce and Rapid Cycling Through Special Interests

Ms. Pilisuk and Junes were married for eight years. ██████████████

████████████   As Ms. Pilisuk testified, parenting did not come naturally to her. Given that

her mother and father were her models for parenting, this is wholly unsurprising—even

discounting her ASD. Ms. Pilisuk loves her child and tried to provide him with

opportunities, structure, and a foundation she did not have. Ex. 1.

After Ms. Pilisuk got divorced, she cycled through various fixations and

interests—she became obsessed with absinthe, became a compulsive exerciser, and

discovered outdoor activities such as hiking and rock climbing. As was her pattern, she

would commit herself wholeheartedly to each fixation, basing her friendships and peer

networks solely on those special interests, meaning that once she was no longer fixated

on the interest, she had no social capital or connection to the social networks.

Eventually, one of her hobbies led her to meet her second husband, Josh.

She and Josh shared more than just their love of outdoors. They were also both

employed in the tech industry and were interested in travel. This was the most "normal"

romantic relationship Ms. Pilisuk had ever had, until a conversation between the two of

them led to what would be her most damaging and harmful fixation—incest.

Josh's disgusted and appalled response to her disclosure of having had a "sexual

relationship" with her father immediately put Ms. Pilisuk on the defensive. His demand

that she stop seeing or speaking to her father caused her to dig in even further. She

began seeking out information on the internet that would validate her belief that she had

"seduced' her father and that the relationship was "consensual." This was the spark that

led to her running the Community Incest website, her friendships with multiple

individuals with admitted sexualized interest in children, and her eventual arrest and

incarceration.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## II.    THE OFFENSE CONDUCT

Ms. Pilisuk maintains her innocence as to all charges and convictions. However, as she states in her letter to the Court, she takes responsibility for her failures and her role in the abuse of ███ Ex. 1. She understands that her obsession with incest, the concept of consent, and her distorted view of the childhood sexual abuse she had suffered were what created the environment for ███ to be victimized. *Id.* Now, after years of targeted, non-confrontational, and therapeutic communication, she is remarkably astute about the ways she damaged ███ how she did, and why she did.

Ms. Pilisuk testified about her parenting style during her trial. An example she gave the jury was that she believed her son should have been riding the city bus to school when he was only seven years old. Ex. 2 at 506. While the jury did not have the context for this belief, this Court now does. Because of her autism, without an explicit explanation of the rules and norms of parenting a seven-year-old child, Ms. Pilisuk will not intuit them. This deficit is even more critical because of the rules and norms that were present during her own childhood. When Ms. Pilisuk was seven, her mother expected her to be an equal, contributing member of the household. When she was seven, they had moved to Kansas because her mother could not care for her without help. When she was seven, she was being sexually abused by her uncle. She had already been inundated with her mother's paranoia and delusions, been purposefully isolated from the outside world, and was expected to care for her adult parent.

As an autistic adult expected to raise her own child, Ms. Pilisuk had not intuited the appropriate age for children to be independent enough to ride a city bus. She was not intentionally putting her son in harm's way. She was trying to encourage independence and self-reliance in her child but did not understand the socially acceptable way to foster these values in a seven-year-old.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Similarly, Ms. Pilisuk testified that she "had this weird, fucked-up view of reality where I thought if ▮▮▮ knew everything about sex and these things that none of this stuff could ever happen to him. You know, I told him about child pornography. I was very open with him. I explained these things to him in hopes that it wouldn't happen to him. It sounds crazy when I say it, and I know like what was on my site." Ex. 2 at 531. Ms. Pilisuk readily acknowledged that allowing ▮▮▮ to spend time with individuals who had expressed a sexual interest in children was wrong. But, at the time—like putting ▮▮▮▮▮▮—she believed she was empowering ▮▮▮ and steeling him against sexual abuse and exploitation. She believed she was protecting him by hiding nothing from him and treating him like a colleague.

This was the model ▮▮▮▮ that she had in her own mother. And, of course, the "incest community" she had aligned herself with did not lack for individuals who took advantage of Ms. Pilisuk's distorted thought processes to gain access to ▮▮ including the government's cooperating witness in the case against Ms. Pilisuk.[7]

Again, this ▮▮▮ strategy is wildly inappropriate to anyone with even the most basic understanding of the cultural and social norms surrounding children, sexuality, and safety. But Ms. Pilisuk does not have that basic understanding. She did not intentionally avoid learning ▮▮▮▮▮▮▮ but her autism means she is deficient in both social perception and intuitive social thinking— which are necessary to understanding both social norms and taboos.

In discussing how Ms. Pilisuk's ASD impacted her ▮▮▮ and the details surrounding this case, it is important to recognize that autistic individuals are *not*

---

[7] The "incest website" that Ms. Pilisuk ran also included members who were staunchly against pedophilia, were content creators, or were involved in the legal pornography business. Legal pornography websites frequently release the most searched-for terms to engage the press and draw views to their websites. "Soft incest" terms such as "step-mom" and "step-sister" were frequently in the top searches from 2015–2019.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

predisposed to committing crime, though it does increase the potential for victimization. Ex. 3 at 31; Vinter, Dillon, and Winder, *"People don't like you when you're different":* *Exploring the prison experiences of autistic individuals*, PSYCHOLOGY, CRIME AND LAW, March 23, 2020, attached as Ex. 7. It is also important to be clear that while research suggests "autism does not predispose an individual to commit sexual offences, autistic traits may *contribute toward the lead up* to committing sexual offenses." *Id.* (emphasis added).

Ms. Pilisuk maintains that she did not commit the offenses she has been convicted of. However, her involvement in the incest website and community, and her desperation for acceptance and "real friends" from that group, as well as her distorted thinking about how to communicate and interact with ███████ around issues of sexuality, consent, and "taboo" or illegal sexual behavior, should be examined through the lens of her ASD.[8]

### III.   THE SENTENCING GUIDELINES AND DISPARITY

The defense maintains its objection to the PSR calculation of the Guidelines. Specifically, the application of the obstruction of justice enhancement found at U.S.S.G. § 3C1.1 should not be applied as the facts underlying its application have not been proven by a preponderance of the evidence.

The Court should consider that the Guideline range in this case is far greater than necessary to achieve the sentencing factors set out in § 3553(a). It is clear from the sentences received by defendants in this district with similar charges and similar criminal histories that a sentence of life or 360 months creates an unwarranted sentencing disparity. *See* Ex. 8 (identifying sentences for all known cases within the district from 2000 to 2024 where 18 U.S.C. § 2241(c) was initially charged).

---

[8] Almost all research conducted in the area of ASD and sexual offenses focuses on male offenders. However, the findings as they relate to the traits of ASD and how they impact an individual's actions are relevant across genders.

SENTENCING MEMORANDUM
(*U.S. v. Pilisuk*, CR22-001-TL) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## IV.   THE MANDATORY MINIMUM SENTENCE OF 30 YEARS IS UNCONSTITUTIONALLY CRUEL AND UNUSUAL[9]

While constitutional challenges to mandatory minimum sentencing laws have rarely been sustained, this is precisely the type of case in which the imposition of a 30-year mandatory minimum sentence would be "cruel and unusual punishment."

Although a mandatory minimum sentence does not violate the Eighth Amendment simply by virtue of being "mandatory," the Supreme Court has acknowledged that a non-death sentence may be so disproportionate that it is cruel and unusual. *Solem v. Helm*, 463 U.S. 277, 292 (1983). The concept of proportionality "is viewed less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society." *Miller v. Alabama*, 567 U.S. 460, 469 (2012). Further, the right to be free from cruel and unusual punishment is based in the idea that "punishment for crime should be graduated and proportioned to both *the offender* and the offense." *Id.* (emphasis added) (internal citations omitted).

The Supreme Court has acknowledged that its Eighth Amendment jurisprudence is a "thicket" through which courts must wade. *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). However, the principle of "gross disproportionality" is the guide for determining whether a non-capital sentence violates the Constitution. *Id.*; *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014). The Ninth Circuit has found that a defendant can meet this standard in two ways: through an "as-applied" or categorical challenge. *Id.*

### A.   The 30-Year Mandatory Minimum Is Unconstitutional as Applied

In assessing whether "all the circumstances in a particular case" lead to a determination that a non-capital sentence is cruel and unusual, the Court first compares

---

[9] Ms. Pilisuk also raises and preserves an Eighth Amendment challenge to 18 U.S.C. §§ 2251(a), 2251(e), and 2423(a) on both categorical and as-applied grounds for substantially the same reasons raised below as to 18 U.S.C. §§ 2241(c) and 2246(2).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

"the gravity of the offense to the severity of the sentence." *United States v. Williams*, 636 F.3d 1229, 1232 (9th Cir. 2011). Where there is an inference of gross disproportionality, the Court must then "compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id.* (internal citations omitted).[10]

Here, Ms. Pilisuk's convictions are undoubtedly for very serious crimes. However, the gross disproportionality of imposing a 30-year mandatory minimum for aggravated sexual abuse of a minor but having no such mandatory sentencing requirement for a second-degree homicide case is telling. *See* 18 U.S.C. § 1111(b) ("Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or life."). To require the imposition of a 30-year sentence in a case that does not involve the loss of life while providing no vehicle for a sentencing judge to meaningfully consider the mitigating facts of the offense, the defendant, or the § 3553(a) factors is cruel and unusual punishment.

Engaging in the second part of this analysis—comparing the defendant's sentence with the sentences received by others—is complicated by the fact that there is a limited data set relating to this specific offense both within this district and outside of it. Every individual who received a sentence for a violation of 18 U.S.C. § 2241(c) received a sentence of at least 30 years (barring a downward departure for substantial assistance). More helpful for this Court is a review of cases since the mandatory

---

[10] The Ninth Circuit has addressed Eighth Amendment challenges to the 30-year mandatory minimum at issue in a series of unpublished decisions. *See United States* v. *Lyons,* 363 F. App'x 485 (9th Cir. 2010) (affirming 30-year sentence); *United States v. Sandcrane,* 311 F. App'x 54 (9th Cir. 2009) (affirming district court finding that statute did not violate Eighth Amendment); *United States v. Armstrong*, 808 F. App'x 418 (9th Cir. 2020) (reversing district court's finding that statute violated the Eighth Amendment).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

minimum became law.[11] Attached as Exhibit 8 are charts that show every defendant initially charged in this district with a § 2241(c) offense as well as the eventual resolution of their case (if available). Of the 24 cases in the past 14 years where the initial charges included a § 2241(c) charge, only two defendants received a sentence of 30 years or more. *Id.* The average sentence was 177 months.

Even absent details about the individual cases, it is alarming that whether an individual received the mandatory minimum appears to be driven not by the severity of the underlying conduct or an individual's characteristics but whether the individual proceeded to trial. *Id.* This, in itself, is compelling evidence of the gross disproportionality of the mandatory minimum—its application is not based upon the conduct underlying the charge, but rather the procedural posture of the case prior to sentencing.

Outside of the federal system, sentences for the type of offense Ms. Pilisuk was convicted of vary considerably. Ex. 9 (Compilation of State Statutes and Penalties). In Washington State, rape of a child in the first degree would lead to an indeterminate sentence with a guideline range of 20–26.5 years. RCW 9A.44.073. Across the border in Oregon, first-degree rape of a victim under 12 years old results in a sentencing range of 121–130 months. In Pennsylvania, rape of a child is punishable by any term up to 40 years. 18 Pa. Stat. and Cons. Stat. Ann. § 3121. Indeed, most states impose penalties of 25 years or less for the same or substantially similar crimes. *Id.* That Ms. Pilisuk would have faced less punishment for the same or similar crime in a majority of state jurisdictions offers additional evidence that the 30-year mandatory minimum is grossly disproportionate. While sentences for this conduct are certainly severe, few are as draconian as that faced by Ms. Pilisuk.

---

[11] Prior to the passage of the Adam Walsh Act in 2006, no mandatory minimum applied to the statute.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**B.      Categorical Challenge**

Ms. Pilisuk also maintains that the application of the 30-year mandatory minimum to female sex offenders and/or to sex offenders diagnosed with ASD constitutes cruel and unusual punishment. While the research and data on this subset of defendants is sparse, the research shows that female sex offenders are categorically different than male sex offenders. And, while still a developing area of science, the available research on ASD also shows that—as with juveniles—individuals with developmental disorders should be treated differently by the criminal justice system, particularly in sex offenses.

**1.      Female Sex Offenders Are Different**

A recent review of the studies and research done over the past 20 years reflected that while insight and "research into patterns, specific or predictive markers, and factors related to offending for [female sex offenders] is still in its embryonic stage" the "[e]vidence indicates that *gender matters* when considering tools" for the treatment of female sex offenders and conducting risk analyses. Augarde, Sophie, et al., *Female perpetrators of child sexual abuse: A review of the clinical and empirical literature—A 20-year update*, AGGRESSION AND VIOLENT BEHAVIOR 62 (2022) at 14 (emphasis added), attached as Ex. 10. Studies conducted on female sex offenders make clear that the tools used to analyze risk factors and predict recidivism are insufficient for assessing female offenders because they were developed specifically for male sex offenders. *Id.* The authors found that "there appears to be very little research regarding the role of neurodevelopmental disorders, such as Autism Spectrum Disorder (ASD) and Attention Deficit Hyperactivity Disorder (ADHD), and female child sex offending." *Id.*[12]

---

[12] While Ms. Pilisuk's case was pending in state court, the government was provided a number of assessments, including a polygraph examination indicating no deception in her denials of criminal activity, as well as a psycho-sexual evaluation and addendum to

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    While the assessment tools are woefully inaccurate in assessing risk factors or

2  the likelihood of recidivism for female offenders, the available data indicates that the

3  likelihood that a female sex offender will recidivate with another sexual crime is

4  extremely low: only 1%. *Id*. at 13. And even if this number underrepresents the actual

5  rate of re-offending because of non-reported conduct or other factors, it is far lower

6  than studies of male sex offender recidivism rates. *See* Przybylski, Roger, "Recidivism

7  of Adult Sex Offender Recidivism" Department of Justice, Office of Sex Offender

8  Sentencing, Monitoring, Apprehending, Registering, and Tracking, July 2015, attached

9  as Ex. 11. The Department of Justice itself has acknowledged that the difference

10  between male and female recidivism rates "suggests that intervention and management

11  practices need to differentiate between male and female sex offenders…." *Id.* at 5. This

12  difference provides further support for finding that the 30-year mandatory minimum

13  constitutes cruel and unusual punishment here.

14         **2.    Defendants with Autism and Sex Offenses**

15    The Court should also consider the disproportionality of imposing a mandatory

16  minimum sentence on any autistic defendant, particularly in the context of sex crimes.

17  Autism is a disorder that specifically impacts an individual's brain from birth. There is

18  a burgeoning field of research that addresses the impact of autism on criminal behavior

19  and culpability. Autism impacts a person's understanding of social norms and taboos.

20  Individuals with autism may tend to fixate on a particular interest or person. Such

21  difficulties with social interaction or understanding nonverbal cues or body language

22  may contribute to the "lead up" to sexual offenses. Ex. 7 at 3–4 (internal citations

23  omitted).

24

25  _____

26  the evaluation. The addendum to the initial evaluation was an independent review that
cited to the same factors and research cited here in fundamentally invalidating the initial
assessment.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Research shows that inappropriate sexual behavior exhibited by people with autism may be seen as deviant when such behavior is not malicious or even intentional, but rather a progression of the symptoms of autism taken to their extreme. While this does not change the harm that may result from the behavior, it certainly impacts a Court's analysis of relative culpability for the crime. A recent filing challenging a mandatory minimum sentence for an autistic defendant in the Middle District of Florida included a chart that gathered sentencing data and information on 118 federal child pornography cases (including production and non-production cases) involving defendants with autism. *United States v. Marks*, No. 17-cr-257-PGB-LHP (Dkt. 361). The nationwide data gathered showed that where the issue of an individual's autism was raised and discussed by defense counsel, both prosecutors and courts have considered it a significantly mitigating factor. *Id.* This trend supports a finding that the imposition of a mandatory minimum 30-year sentence for a sexual offense by an autistic defendant, without discretion to consider the diagnosis and its impact on culpability, constitutes cruel and unusual punishment.

Finally, the impact of any prison sentence on an autistic individual is far more punitive than for a neurotypical defendant. Ex. 6 at 5. Lack of control over routine, confusing and contradictory social rules, sensory discomfort, and vulnerability to abuse and victimization can make prison a tortuous and debilitating experience for individuals with autism. *Id.*; *see also* Chiara Eisner, *Prison is even worse when you have a disability like autism*, THE MARSHALL PROJECT, November 2, 2020, avail at https://www.themarshallproject.org/2020/11/02/prison-is-even-worse-when-you-have-a-disability-like-autism.191 (detailing the experience of inmates with autism and noting the particular challenges faced by individuals with developmental disabilities making them "especially vulnerable to exploitation in prison.").

SENTENCING MEMORANDUM
(*U.S. v. Pilisuk*, CR22-001-TL) - 18

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1   This Court should hold that a mandatory 30-year sentence for a female sex

2   offender or a sex offender with ASD does not allow individualized consideration of

3   these specific characteristics, which (like youth) directly impact a defendant's

4   culpability for the conduct, danger to public safety, recidivism, amenability to treatment

5   and rehabilitation, unique vulnerability within the prison system, and other factors

6   unique to autistic or female sex offenders. *See e.g. Miller,* 567 U.S. at 479–80 (holding

7   a mandatory sentencing scheme for juveniles unconstitutional because it precluded

8   consideration of the specific quality (youth) that had the greatest risk of making such a

9   sentence disproportionate).

## V.   THE TYPES OF SENTENCES AVAILABLE AND REQUESTED JUDICIAL RECOMMENDATIONS

Because Ms. Pilisuk may be spending the rest of her life in custody, this Court's

recommendations for placement must be taken seriously by the Bureau of Prisons. The

defense asks the Court to make the following specific recommendations to the Bureau

of Prisons.

### A.   Placement at FCI Danbury (Management Variable)

The defense asks that the Court recommend Ms. Pilisuk be designated to FCI

Danbury. While the defense anticipates that Ms. Pilisuk will be designated as a low-

security inmate, a judicial recommendation of a management variable and placement at

a specific facility will be seriously considered by the Bureau of Prisons even if this is

not the case.

While placement at FCI Danbury will result in Ms. Pilisuk living across the

country from her mother, there is no federal facility housing women that would allow

Ms. Pilisuk's mother greater access to her. FCI Danbury is a low-security facility with

an adjacent camp and is the safest and most well-suited facility for Ms. Pilisuk to serve

her sentence. The defense asks that the Court specifically recommend a waiver of any

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

management variable that would result in a security designation above "low" for Ms. Pilisuk.

As investigations and lawsuits have uncovered rampant abuse suffered by women in prison, it is evident that federal prisons have failed to keep women safe.[13] Even more disturbingly, federal facilities specifically intended to house the most medically and psychologically vulnerable women have failed to protect their residents. Because Ms. Pilisuk's unique neurological and psychological profile make her more susceptible to rape and sexual abuse, the danger that she will suffer such abuse in prison is heightened. Ex. 3 at 31 (noting that statistics show that people with ASD are "sexually assaulted at a rate seven times higher than their nondisabled peers."). While not immune from the plague of predatory abuse, in the most recent PREA report on FCI Danbury, it was found to meet and/or exceed standards in every category analyzed by the auditor and had significantly fewer reports of rape and sexual abuse than other facilities. Pub. April 2024 (avail at Prison Rape Elimination Act (PREA) Final Audit Report for FCI Danbury (bop.gov)).

As the only facility housing women in the Northeast, FCI Danbury has a history of providing its residents access to educators, volunteers, and experts from the surrounding metropolitan areas and universities. Ms. Pilisuk desperately wants to continue her education, assist others in accessing educational resources and higher education, and participate in as much programming as possible. Given the nationwide staffing shortages in BOP facilities, Danbury's established connections to the outside community are Ms. Pilisuk's best chance at achieving these goals.

---

[13] Michelle Balsamo and Michael R. Sisak, *AP investigation: Women's prison fostered culture of abuse*, AP NEWS, February 6, 2022, avail at https://apnews.com/article/prisons-california-united-states-sexual-abuse-only-on-ap-d321ae51fe93dfd9d6e5754383a95801 (discussing AP news investigation into "rape club" at FCI Dublin).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**B.      Accommodations Under the ADA**

Whether through negligence or inability, the FDC has been unable to provide adequate accommodations for Ms. Pilisuk. To be fair, the facility has had to manage a continuous and unrelenting staffing shortfall and an influx of female residents who were unexpectedly transferred after the closing of FCI Dublin.

Ms. Pilisuk is particularly sensitive to routine changes, bright lights, loud noises, and other stimulation. Simple accommodations such as noise cancelling headphones, the existence and accessibility of a "quiet room" or "quiet space," and the ability to work a job that is suited to her disabilities would make the decades she will spend in custody slightly less tortuous.[14]

**C.      Access to Email (Management/Security Variable)**

The Court should specifically recommend that the BOP waive any prohibition on Ms. Pilisuk's use and/or access to Corrlinks (or any other monitored email system used during her incarceration).

Recently, the BOP instituted a policy of removing access to email from inmates convicted of sex offenses claiming such restrictions are required by the Adam Walsh Act. There is no provision in the Adam Walsh Act directing such a restriction. The only requirement of the Bureau of Prisons under the Act is that it provide both residential and non-residential sex offender treatment to inmates and that it must inform individuals who are releasing into the community of their duty to register as sex offenders.[15]

While the BOP certainly has discretion in managing its population and instituting policy for public safety, this restriction is inappropriate and unconstitutional

---

[14] Eisner, *Prison is even worse when you have a disability like autism*, THE MARSHALL PROJECT, November 2, 2020.

[15] Adam Walsh Child Protection and Safety Act of 2006, L. 109-248, July 27, 2006, 120 Stat. 587 (2006).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

as applied to Ms. Pilisuk. The email communication system used by the BOP is restricted and monitored. Inmates do not have unfettered access to the internet. Nor do they have unlimited or unmonitored email access.

Email will be Ms. Pilisuk's primary (and often sole) method of communicating with her appellate attorneys, family, and friends. Restriction of her access to email is not warranted by the circumstances of her case, the Adam Walsh Act, to protect the public, or by any applicable law or policy.

The defense asks that the Court specifically state in Ms. Pilisuk's judgment that she be given access to email for both legal and personal purposes.

### D.   Restitution Should Not Be Paid Until Release from Custody

Outrage about celebrity defendants with exorbitant amounts of money on their commissary accounts led the Bureau of Prisons to draft and propose a new policy to allow significantly higher percentages of inmate commissary accounts to be seized to pay restitution. While this may result in wealthy federal defendants paying restitution faster, the impact on indigent defendants like Ms. Pilisuk cannot be overstated.

Ms. Pilisuk relies on her family to send her money, and she will continue to rely on this support for her entire sentence. There may be months where she has more money on her commissary account and there may be months where she has less, depending on the financial state of her family. Because of this, she asks the Court to either decline to check the box on her judgment requiring restitution be paid during her custodial sentence or to specifically designate that she pay *only* $25.00 per quarter while incarcerated.

## VI.   OBJECTIONS TO PROPOSED CONDITIONS OF SUPERVISION

Generally, Ms. Pilisuk objects to any proposed special condition of supervision that is not mandated by the Adam Walsh Act. Ms. Pilisuk does not object to Special Condition 9, as it is required under the Act.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   The defense objects to Special Condition 3 as it relates to adult pornography.

2   The defense objects to Special Condition 4 as redundant of Special Conditions 1

3   and 15.

4   The defense objects to Special Condition 5 as unconstitutionally overbroad and

5   vague.

6   The defense objects to Special Condition 6 insofar as it requires Ms. Pilisuk to

7   submit to polygraph testing "as a means to ensure that [she] is in compliance with the

8   requirements of [her] supervision" as an impermissible infringement upon her liberty

9   and notes that this condition has been upheld by the Ninth Circuit *solely* as a tool for

10  sex offender treatment. Imposing this condition as a means to ask Ms. Pilisuk questions

11  about her "compliance with the requirements of her supervision" would violate her

12  constitutional right not to make self-incriminating statements.

13  The defense objects to Special Condition 11 as it specifies any requirements for

14  treatment beyond the program following the guideline practices established by the

15  Association for the Treatment of Sexual Abusers. The defense also objects to this

16  condition insofar as it requires disclosure of "all previous sex offender or mental health

17  evaluations to the treatment provider." This condition would require potentially

18  privileged and protected information or work products created in preparation for trial to

19  be produced to a treatment provider and/or Probation.

20  The defense objects to Special Condition 13. ████████████████████

21  ███████████████   If MV1 chooses to initiate contact with Ms. Pilisuk, he should be

22  permitted to do so. This condition should, at the very least, be rephrased to state that

23  Ms. Pilisuk "shall not *initiate* any contact with the victim, by any means, including in

24  person, by mail, electronic means, or via third parties, without the approval of the

25  probation officer. If any contact occurs, the defendant shall report the contact to the

26  probation officer within one business day."

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## VII.   CONCLUSION

Shabnam Pilisuk is prepared to receive a sentence far greater than necessary—not because this sentence represents justice or is fair or because it achieves any of the goals of sentencing. She is prepared to receive this sentence because she knows that the legislative and executive branches of government determined her sentence before any individualized consideration by this Court.

The mitigating factors supporting a sentence below the 30-year mandatory minimum are abundant. Ms. Pilisuk's history and characteristics present a uniquely traumatic childhood involving years of sexual abuse, victimization, comorbid mental health and developmental disorders, neglect, and self-medication. Her experience of managing the world with undiagnosed autism and parents who (perhaps unwittingly) took advantage of her social deficits is remarkable in that she survived and—for years—even thrived.

Ms. Pilisuk asks the Court to consider the particulars of her life, to consider her as the imperfect and traumatized individual who she is and sentence her to the least amount of time the Court believes sufficient, but not greater than necessary.

DATED this 25th day of September 2024.

Respectfully submitted,

s/ *Sara Brin*
Assistant Federal Public Defender
Attorney for Shabnam Pilisuk

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**